May it please the Court, my name is Mark Fink. I'm here with the Plaintiff Appellant Center for Biological Diversity. I'm going to shift over to endangered species and All right, we'll move from options to endangered species. This case concerns the Warm Fire Logging Project, which is on the Kaibab National Forest, just north of the Grand Canyon National Park in northern Arizona. And there's no dispute in this case that the logging project would log over 3,000 acres of designated critical habitat for the Mexican spotted owl. Under the Endangered Species Act, if a project may affect a listed species or its critical habitat, the action agency, here the Forest Service, needs to formally consult with the Fish and Wildlife Service, through which a biological opinion would be prepared. Here however, the Fish and Wildlife Service concurred with the Forest Service's not likely to adversely affect determination, and thereby avoided the formal consultation requirement. Now plaintiffs challenged this letter of concurrence on two grounds. First, that Fish and Wildlife Service failed to consider relevant factors in its letter of concurrence. And there are two factors that we focused on. First is Fish and Wildlife Service failed to address its prior determination that the area is occupied and that the area is an important area for owls to disperse and forage in. Let me just, if I may, ask you a question about that. It seems to me that many arguments in your brief related to the Endangered Species Act are based on the idea that the Fish and Wildlife Service letter of concurrence was somehow irreconcilable with its earlier comments on the Warm Fire Recovery Project. But isn't it true that Federal courts ordinarily are empowered to review only the final action, i.e., these agencies are permitted to change their minds until they have final action? That's correct, Your Honor, from the Homebuilders case. In this case, Your Honor, I would clarify that this case is more of a situation where an agency's final determination directly conflicts with all of the prior evidence in the record, where it's not even changing its course because we don't know what it did. It determined through its comments all along throughout the process that the Forest Service needed to do a number of recommendations for this project to not likely adversely affect the species, and it specifically determined that a number of the activities associated with the project would impede the Mexican spotted owl's habitat, including tractor logging on severely burned soils. If you look at their comments on the draft EA, which is that excerpt of record around 100 to 105, it very explicitly goes through what is going to impact the critical habitat for this species, talking about the felling and the hauling and the logging of the trees on burned soils and how that will directly impede the habitat. There's no changed course in that because there's no subsequent finding where it determined, well, that's actually not going to happen. Instead, it just we have a black hole where between that and the letter of concurrence, it's not addressed. Instead, we just have a very summary finding in the letter of concurrence that, yeah, we agree, not likely to adversely affect. So your argument really is there isn't sufficient evidence to support the letter of concurrence. That's right, Your Honor, and that it directly conflicts with all the prior evidence in the record. But you use that interim report as prior evidence, in effect? I do think, Your Honor, that, you know, under the Administrative Procedures Act, the court has to look at the entire record that was before the agency. It can't just look at the three-page letter of concurrence. And, you know, under the arbitrary and capricious standard of review, one of the reasons the courts have found that an agency is arbitrary is if its decision conflicts with all the prior evidence in the record, which we feel in this case it does. And not only does it conflict, it conflicts with the agency's own experts, which, you know, it's almost like there's two ships passing in the night. One of the ships has all of this evidence through formal comments on the scoping, the draft EIS, the draft biological assessment, all finding that there's going to be impacts here unless they incorporate a number of recommendations, including not logging on burnt soils with tractors and not logging anything over 20 inches. In the other direction, we have not even a ship. We have a small boat that says, well, if you add some more discussion, everything's probably going to be okay. These things never meet. Instead, at some point, they decide to abandon the ship going in one direction and to jump on the small boat. But there needs to be some explanation to have any sense under the Administrative Procedures Act as to why the court would even review these sorts of decisions if an agency can just totally abandon ship in the middle of the night without anybody knowing. It totally dissuades the public from being involved in these decisions. If they can track it for months saying, okay, the Fish and Wildlife Service says this, they say this, they still say this, and all of a sudden you get to the end of the process and there's just a one-page letter of concurrence saying, ah, it's okay, you can go ahead, without ever explaining all these past determinations and findings. Well, Mr. Fink, wasn't Fish and Wildlife desirous or supportive of the idea of improving the habitat that's spotted out? Isn't that so? Now, the way they were doing it, you said actually destroyed or whatever had an adverse effect on the habitat. But they wanted to improve it. Isn't that right? Well, I think that's everybody's long-term goal is to improve this habitat. But if you look at the Fish and Wildlife Service's comments, again, just a couple months before the letter of concurrence when they are commenting on the draft biological assessment, they say it will impede the habitat. They say that in numerous places. Well, and it might. But Ed, isn't it the case that the spotted owl had not been seen in this area for nine years? My understanding of the record, Your Honor, is that most likely there's not nesting owls in this area. But the Fish and Wildlife Service throughout the administrative record has thought that this could play an important role for dispersing owls and foraging owls because we know there's owls north of the area, we know there's south of the area. And because there has been surveys that have shown owls in the area, although from years ago, they still feel that this is an important area for foraging. And if you look, ironically, there was a biological opinion prepared by the Fish and Wildlife Service for a much smaller project in this very same area where they continued to assert, even post-fire, that this area plays important habitat for foraging and dispersing owls. I'm sure it would, but if you have to redo the area in a certain way to make it better, while you're redoing it, it's probably not going to be usable or attractive or whatever, this spotted owl. But the goal is to then produce an area that will supply appropriate habitat. Is that what they were trying to do? Well, I mean, there's various aspects of this project. Part of it is planting, which we've never opposed. And we do agree that some planting might help speed up the recovery of this area over decades. And I don't think there's any dispute there. The problem is with the tractor logging on burnt soils and the logging of large trees, where the Fish and Wildlife Service itself says it's going to impede the recovery of the area in their comments on the draft biological assessment. And there's no reconciliation with that between their and their later letter of concurrence. Well, the point is they can change their mind. It's OK. But if you're going to change your mind, give us an explanation for it. Well, that's a short answer. But I'm saying they didn't even really change their mind on their specific findings. They changed their mind on their conclusion. But their findings, they never addressed why, if they're even changing their mind. OK. So one of the things that comes out is that the spotted owl is using this habitat in terms of these burned trees in the short term versus the long term. And, of course, by the time this project is going to be embarked on with the logging, it's in the long term. It's a little longer term than the short term that the owls were going to be using the burned trees. So what then would be the problem with proceeding with this selective logging that they're talking about in light of that evidence? Well, the second factor that we're going to say was not addressed was this evidence on the use of owls, on the use of burnt forest by owls. And there's a report in the record that's actually called Associations Between Forest Fire and Mexicans Spotted Owls. You can't get much more directly relevant. And yet it was never considered in the letter of concurrence. And the government throughout this case has said that, well, owls only use it for the short term and they don't really use severely burned forest. But this report finds the opposite. It says that owls were present at several sites that had experienced severe wildfires and there was no significant difference in occupancy in relation to the time since the fire. And this is a Forest Service report from their own research station. It's at Excerpts of Record 2002. And one place that I made a minor misstatement in my reply brief is I conceded that there were some changes made to this project between the Fish and Wildlife Service's comments and the letter of concurrence. When I went back and looked, there really were not. If you look at the draft environmental impact statement and the final environmental impact statement, all of the relevant issues that we're talking about here were the same. The acreage, the board feet, the number of snags to be retained in the spotted owls' habitat, the ground-based logging on severely burned soils, all of that is the same. There was no changes made between the Fish and Wildlife Service's very strong comments and its April 30, 2008 comments, from there to the August 2008 letter of concurrence. So you can compare the draft environmental impact statement at Excerpts of Record 125 with the final record of decision at 31 and 32 and see that there were no changes were made. And so really, all that was added was some more discussion. And I just cannot see how you can look at the Fish and Wildlife Service's, again, very strong comments on you need to do X, Y, and Z, and we think this is going to impact the habitat. And then two months later, just because there was some added discussion, a couple pages added to the biological assessment, that somehow that explains this dramatic change of course. Unless there's more questions on the owl, I'll switch over to the bat species that we're also arguing about. There's a requirement in the forest plan for the Kaibab National Forest that requires the Forest Service to prepare a biological evaluation in order to document the effect of selected actions on the viability of the population of the sensitive species in an ecosystem management area. I know this court has spent quite a few years looking at very similar standards and very similar cases as to what it means to ensure that the viability of a population on a national forest. Now for the Allens Lapid Brow bat, which is a sensitive species and for which very little is known, the Forest Service acknowledged that there was going to be impacts. It said the project may disturb their maternity colonies, which will result in abandonment. And then it also concedes that there will be impacts to the local population, but then what we challenge is they arbitrarily determine that it's not likely going to impact their population trend. And the reason we think that is arbitrary is for a number of reasons. One, they have no idea what the population trend is. They have no idea what the population is. They don't know what the distribution is. They know very little about this species. As we get to the next level, well, they say, well, we know that we're going to protect this habitat. But there's also nothing in the record that shows what the quantity and the quality of habitat is that would ensure the viability of the species. The only thing in the record that gets to this issue that both sides have pointed to is this Rabia report from 1998, which the Forest Service says, well, this shows that if they comply with their plan standards, that's okay. But what that report found is that the plan standards are just a snapshot in time and that really what needs to happen here is that all snags need to be preserved until they develop a long-term plan to protect these species because so little is known about them. So the conclusion of this report is that all snags need to be preserved and that they need to develop a long-term plan to protect this species. It's not that forest plan standards are okay. That's just not a fair reading of that report. And if you look in the biological evaluation and the EIS, it's even less than that. It doesn't even talk about the Rabia report. It just cites to it. So there's nothing in the biological evaluation that would give the public any sort of fair notice as to what the quality and the quantity of habitat is that would ensure the viability of the species. And it also doesn't take that next step and show that it's going to be met. Do you want to reserve your remaining time? I would like to say one more thing. The Forest Service says a number of places that relies on the superabundance of habitat. The word superabundance never appears in the draft EIS. This was a word that the district court relied on. But it doesn't appear anywhere. And, in fact, there's not a superabundance of snags. The EIS itself says that for looking at trends of habitat, they're supposed to look at the geographic area 13, which it acknowledges that ER 45 is deficient in snags. And it takes the next step and says that even after the warm fire, it's still deficient in snags because it doesn't make up for the past problems. And I'll leave the rest for rebuttal. Thank you. Mr. Scott. Thank you, Your Honors. Good morning. And may it please the Court, Charles Scott on behalf of the federal agencies. I'd like to start off with a couple of general points to address what Mr. Fink has mentioned. First, as Judge Thompson essentially noted, this recovery project is not just about logging. It is indeed about regenerating functional Mexican spotted owl habitat in the long term. That will be achieved faster through this project than through natural recovery processes. It is true that some acres will be cut. But all acres of Mexican spotted owl habitat that will be cut will be regenerated, either through planting or through reliance on natural seed sources. Another purpose of the project, however, is to reduce the risk of future severe stand-replacing fires such as this one. This, I think, the Kaibab is another forest in the southwestern United States whose natural fire suppression, whose natural fire ecosystem response has been affected by management over time. Were there a less dense forest, had past fires been allowed to burn and replace low levels of vegetation, there would not be a buildup that would allow an enormous wildfire such as the warm fire. One of the purposes of the warm fire recovery project is to reduce the amount of fuels that could cause future catastrophic wildfires such as this one. So the cutting itself, by removing dead snags, does remove fuel that could be a source for future fires. That was not something that we necessarily mentioned in our brief, but the record at Supplemental Excerpts 28 to 29, 233 to 34, 249, 239 to 240 and 284 all talk about the benefits of fire suppression from harvesting dead snags. Again, however, all the acres to be harvested will be regenerated, and that regeneration process will happen faster than it would in the project's absence. And for Mr. Fink to say that his organization or his clients support the planting but not the cutting, well, to a certain extent, the cutting has to come first to remove some of the existing ongoing fire fuel. And from a realistic standpoint, there isn't necessarily money for planting and regeneration activities in the Forest Service's budget in the absence of some revenues from salvage sales. The next general point I'd like to make is that in his briefing and again in his remarks today, Mr. Fink has given the impression that there is, as he put it, a black hole, that the Fish and Wildlife Service through April of 2008 was saying one thing, and then mysteriously there was a three-page letter that reversed itself with that explanation. As our brief mentioned in a footnote, the process of informal consultation under the Endangered Species Act includes all discussions between the two agencies. And this was a process here that began in an interagency meeting in October of 2006 and culminated in the letter of concurrence in August of 2008. Let me ask, why was informal consultation appropriate in this case? It was a claim in the briefs that was to avoid formal consultation. Your Honor, the reason that informal consultation was deemed appropriate here was the regulations, 50 CFR 402, parts 12, 13, and 14 say, if the action agency provides a biological assessment whose scientific analyses show that there is not likely to be an adverse effect on listed species, then consultation should conclude informally. Now, the black hole that Mr. Fink points to was filled by the Forest Service's extensive biological assessment, which it provided in June of 2008. It's a 50-page document. It adds certain analyses that the Fish and Wildlife Service had requested. It makes modifications to the project, as discussed on pages 36 to 37 of our brief. And another thing that I did not mention directly in the brief, the initial comments that the Fish and Wildlife Service made were based on the BESHTA study, which said, which is incorporated in the recovery plan for the spotted owl to the extent it says, salvage harvesting should not impede regeneration of functional habitat. That is why, as you pointed out, Judge Thompson, the focus here was on regeneration of functional habitat. That's consistent with the recovery plan. The biological assessment at pages 227, 230, and 231 of the Supplemental Excerpts of Record directly addresses the BESHTA study. It explains that some of the study's conclusions are inapposite because they are drawn from forests primarily of the Pacific Northwest that are ecologically different from Arizona. But it also says that many of the general recommendations are adopted and the project will comply with the general guidance of not impeding recovery of functional habitat. There were... But on the recovery plan itself, the Forest Service didn't actually say it fully complies with the recovery plan. It just made reference to it, but was there an effort to actually say that there was a compliance with it in the end? Yes, there was, Your Honor. The recovery project, the recovery plan provides guidance rather than requirements. But it is Fish and Wildlife Service policy, as we explained, that if an action is found to be consistent with the recovery plan, then consultation ends informally. That is, adverse effects are not likely in the vast majority of circumstances. And again, if you look at the recovery plan, the specific provision that we're talking to from the BESHDA report is on page 316 of the supplemental excerpts, and it says, no salvage harvesting if regeneration will be impeded. If you look at the Fish and Wildlife Service's preliminary comments, and I'm talking about November of 2006 and February of 2007, pages 154 to 158 of the excerpts of record, they say, we adopt the following recommendations from BESHDA, which are designed to prevent so as not to impede regeneration of functional habitat. That, as we argued in our brief, was the crux of informal consultation all along. Will regeneration of functional habitat be adversely affected? And as we showed in the brief, it will be accelerated through the project's various activities. I think that the biological assessment did, it provided the analyses that were asked for. It made modifications. Not all of the recommendations were adopted. That is true. The BESHDA report suggested leaving 50 percent of certain sizes of dead trees. The Forest Service explained that that was something it could not do for economic reasons, because of OSHA requirements imposed by the State of Arizona, and because, again, removal of dead trees does reduce fuel for future fires. So there is a fire reduction component to the salvage logging. I'd like to quickly discuss this Court's Arizona Cattle Growers Association case from earlier this year. In that case, the Court upheld the designation of critical habitat for the Mexican spotted owl, and that was based on the record as it existed in 2004. A number of principles, however, in the Court's decision support what happened here. The Court emphasized that a determination of whether an area is occupied is necessarily going to entail some uncertainty, and it is an issue on which the agency is entitled to substantial deference. It also pointed, as our 28J letter noted, to the fact that agency information does, in fact, evolve, and the agency is entitled to reassess its views if information so dictates. In this case, as we explained, designation — the determination in August of 2008 that 40,000 acres of the North Kaibab Ranger District were not likely to be occupied was based on more recent survey information than the critical habitat designation. And like the critical habitat designation, it focused on the availability of habitat. The critical habitat designation itself, as this Court noted, said, we focused on areas that do provide the primary constituent elements of Mexican spotted owl habitat. And the reality is that Mexican spotted owls require green trees and a forest cover in order to nest and roost, as well as to hunt. The critical habitat rule says they cannot survive if they cannot hunt from forest cover. So by focusing on habitat, acknowledging the fact that information available to the agency does change and that this is upheld under a best available science standard, I think that the Arizona Cattle Grower's case articulated principles that dictate upholding the finding as to the Mexican spotted owl itself here. I think one other point to make. Mr. Fink said that comments on the draft biological assessment showed that there was going to be an adverse effect. If you look at those comments, which are on page 102, it says, based on the description of the proposed action in the draft environmental impact statement. Again, this precedes the watershed point in the informal consultation process. It precedes the biological analysis, the biological assessment produced by the Forest Service, a lengthy document that provided the analyses required for the Fish and Wildlife Service to concur. There is no unexplained reversal here. The record amply provides a basis for affirmance. The only ‑‑ it's the Fish and Wildlife Service's ultimate finding that's at issue, as the Home Builders Association case pointed out. Even still, there is no reversal in this case. What there is is a process of asking for more information, requesting modifications, requests that were answered, analyses were provided, modifications were made, and a thorough record of scientific analysis was developed to allow the Fish and Wildlife Service to concur. To say there's a black hole is to attempt to divert the Court's attention away from the biological assessment, which the regulations provide is the heart of the informal consultation process. On the fire studies, if I may, the biological assessment itself at page 244 of the Supplemental Excerpts of Record, as well as the Critical Habitat Rule at page 170 of the Excerpts of Record, addresses the Bond and Ginesse studies. Both of these studies found that owls use lightly to moderately burned territories, lightly to moderately burned areas within the short term, but importantly, both of them known nesting areas, what would be considered protected activity centers under the recovery plan. Both of them focused on nest and roost sites. There simply are none in the North Kaibab Ranger District. If there were, there would be protected activity centers designated under the recovery plan. There are not. The Forest Service's BA and the Fish and Wildlife Service's Critical Habitat Rule both address these studies and explain why they're inapposite here. And as to whether any modifications were made, I would rely on pages 36 to 37 of our brief where we discuss them. And as to the Allen's Lapid Proud bat, this Court's wildlife viability analysis cases use the best available science standard. That's what NIFMA imposes. There was a prior regulation under NIFMA which imposed a substantive viability requirement. As the Court explained in the Onbonk McNair case and more recently in the Castaneda case, that regulation has been superseded. What we have here is a procedural requirement from the Forest Plan that you must do an analysis of viability. And this Court says that viability should be based on the best available science. Would it be preferable to have more information about the Allen's Lapid Proud bat's population trends? Perhaps. But that is not what the Court requires. The agency is not required to go out and conduct additional information. It is required to act on the best available science to it at the time. And again, I would cite the Kern County and Northwest Ecosystem cases in our brief. As to the superabundance of habitat, if you look at when there's a reference to superabundance, it's not only the fact that more snags are going to be left in place than the Forest Plan requires. Mr. Fink, again, criticized the Forest Plan requirement, relying on the RAVE study. But this project is going to exceed the Forest Plan's requirement for snag retention by the Forest Plan calls for two per acre. This is going to have three to five. It exceeds that standard. Whether that standard is good or not, it's been exceeded. The superabundance point, however, it's important to note that only about 25 percent of the area that was burned is actually going to be subject to any harvesting. The superabundance includes the massive number of snags that were created and will be left in place with no action whatsoever in the remaining 75 percent of the area. So superabundance is certainly a term that the district court came up with. It's a pretty good descriptor and the record amply justifies it. Unless there are any questions, I will probably sit down. Thank you. Thank you. Mr. Fink, I think you have about a minute left. Thank you, Your Honor. I'll go quick. There were no modifications to the projects between the draft B.A., draft E.I.S., and the final B.A., final E.I.S. Any minor changes that did happen are completely irrelevant to what we're talking about here. The changes that they cite in their brief were made far before that, so far before the main comments that were made by the Fish and Wildlife Service. The recovery plan says to follow the best report. That's what Fish and Wildlife Service was trying to require them to do all along, not to log trees over 20 inches and not to track the log on severely burned soils. It also says not to impede recovery. Fish and Wildlife Service found this will impede recovery. As far as foraging and dispersing in the area, again, the hazard tree biological opinion for the same project area looked at the exact same surveys that they looked at for the Warm Fire project and found that it is important dispersing and foraging habitat. Let me just ask, in your reply brief, again, you refer to this black hole, and I'm looking at the excess of record 90 to 92. The FWS's letter of concurrence demonstrates that it had considered the relevant factors before making its decisions. What is your response? There's no place in that letter of concurrence where you can look at whether or not they considered their past comments that this project is going to impede the recovery of the habitat. And there's nowhere in there where they discussed the JANUS report, which is the 2004 report on the use of severely burned areas by owls. There's no place in there to tell whether or not they considered their own finding in 2004 that this area was occupied by the owl or their decision in 2007, their biological opinion, that this area was still important habitat for the species. And it's a two-sentence, conclusory letter on each of the main points. There's just no place in there where they address all of these relevant factors that we talk about in our briefing. Thank you. Thank you. I thank both counsel for your argument. Again, your fluency with the record is extremely helpful to us. The case just argued, Center for Biological Diversity versus the Forest Service is submitted.
judges: Nelson D. W., Thompson, McKeown